# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **TAMIRA TIJERINA,** | § | |
| **Plaintiff,** | § | |
| | § | |
| | § | **Civil Action No. 3:18-CV-0817-BH** |
| | § | |
| **ANDREW SAUL,** | § | |
| **COMMISSIONER OF SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| **Defendant.** | § | **Consent Case**[1] |

## MEMORANDUM OPINION AND ORDER

Tamira Tijerina (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner)[2] denying her claims for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act. (*See* docs. 3; 23.) Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **REVERSED**, and the case is **REMANDED** for reconsideration.

## I. BACKGROUND

On September 22, 2015, Plaintiff filed her applications for DIB and SSI, alleging disability beginning on July 27, 2015. (doc. 17-1 at 231, 233.)[3] Her claims were denied initially on December 16, 2015 (*Id.* at 118-19), and upon reconsideration on April 13, 2016 (*id.* at 154-55). On June 15, 2016, Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (*Id.* at 184.) She appeared and testified at a hearing on May 19, 2017. (*Id.* at 40-73.) On August 23, 2017, the ALJ

---

[1]By consent of the parties and order filed September 19, 2018 (doc. 24), this matter has been transferred for the conduct of all further proceedings and the entry of judgment.

[2]At the time this appeal was filed, Nancy A. Berryhill was the Acting Commissioner of the Social Security Administration, but Andrew Saul became the Commissioner of the Social Security Administration on June 17, 2019, so he is automatically substituted as a party under Fed. R. Civ. P. 25(d).

[3]Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

issued a decision finding her not disabled. (*Id.* at 21-35.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on October 6, 2017. (*Id.* at 227.) The Appeals Council denied her request for review on February 23, 2018, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 5-9.) She timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 3.)

## A.  Age, Education, and Work Experience

Plaintiff was born on October 1, 1968, and was 48 years old at the time of the hearing. (doc. 17-1 at 43.) She completed the ninth grade could communicate in English. (*Id.* at 43, 335.) She had past relevant work as a driver and a certified nursing assistant. (*Id.* at 70.)

## B.  Medical Evidence

On November 3, 2012, Plaintiff presented to JPS Health Network (JPS) with moderate pain in the right foot and heel that was constant and worsened in the mornings, numbness, and the inability to bear weight. (*Id.* at 396.) She also reported experiencing chest wall discomfort at least 8 times a month, but denied chest pain. (*Id.*) Her musculoskeletal review was positive for arthralgia and her neurological review was positive for numbness, but her remaining reviews of systems, including psychiatric and behavioral, were negative. (*Id.* at 397.) An X-ray of her right foot showed no evidence of fracture or dislocation, but osteophytes[4] were seen about the calcaneus, and there was mild degenerative arthritis in the first metatarsal phalangeal (MP) joint. (*Id.* at 415.)

On November 16, 2014, Plaintiff went to Parkland Hospital (Parkland)for dysuria and lower abdominal pain that was sharp and radiated to her lower back. (*Id.* at 424-25.) She reported

---

[4]Osteophytes, or bone spurs, are bony projections that develop along bone edges, especially the joints, but can also form on the bones of the spine. *See* Bone Spurs, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/bone-spurs/symptoms-causes/syc-20370212 (last visited on September 12, 2019).

increased frequency of, and pain, with urination. (*Id.* at 425.) She exhibited suprapubic tenderness, but was alert, oriented, and not in acute distress. (*Id.*) She was assessed with a urinary tract infection (UTI) and was instructed to take 100 mg of Macrobid for 7 days. (*Id.* at 425-26.)

On January 26, 2015, Plaintiff was seen at Parkland for back pain by Dina Hazim, M.D. (*Id.* at 430.) She reported pain along the entire back that was aching in character, 9 out of 10 in severity, and had been present for 6 months. (*Id.*) She also reported pain on the bottom of her right foot, but was able to walk without assistance, and no raised leg signs were observed. (*Id.* at 430-31.) Her musculoskeletal examination showed a normal range of motion with no edema and some tenderness, while her cervical back exhibited spasms but no swelling. (*Id.* at 431.) She was assessed with type II or unspecified type diabetes mellitus (DM) uncontrolled, without mention of complication. (*Id.*)

On February 2, 2015, Plaintiff returned to Parkland for imaging studies of her spine and right foot. (*Id.* at 439-45.) Her cervical spine X-ray showed mild multilevel degenerative changes that were most prominent at C6-C7 where there were small posterior osteophytes. (*Id.* at 439.) It also showed mild bilateral neural foraminal narrowing, but there were no fractures or dislocations. (*Id.*) Plaintiff's thoracic spine X-ray showed no sign of fracture, significant prior injury, or excess kyphosis, but there was moderate disc degeneration with multilevel large anterior and right lateral partial bridging osteophyte formation that was relatively prominent from T4-T5 through T10-T11. (*Id.* at 441.) The X-ray of her lumbar spine showed mild obvious disc base narrowing size degeneration and mild-moderate facet arthropathy at L4-L5d and L5-S1 levels, and minimal (2mm) L4 anterolisthesis relative L5, but an otherwise normal alignment. (*Id.*) The X-ray of her right foot showed mild-moderate first MP joint degeneration with small marginal osteophytes and slight joint space narrowing, but there were no signs of chronic active synovitis or other premature joint

degeneration. (*Id.* at 445.) There were also moderate calcaneal enthesophytes that were more prominent at the Achilles insertion. (*Id.*)

On February 12, 2015, Dr. Dina evaluated Plaintiff's X-rays and laboratory results and assessed her with new onset DM, other and unspecified hyperlipidemia, and osteoarthritis. (*Id.* at 447.) A nurse telephoned Plaintiff about her updated medical assessment and treatment plan. (*Id.* at 447-48.)

On March 21, 2015, Plaintiff returned to Parkland with pain, mild swelling of the right lower eyelid, and blurred vision. (*Id.* at 450.) She had been experiencing tingling and numbness of the right side of her face for the past two days. (*Id.*) She was oriented to person, place, and time, had a normal tandem walk, and displayed normal reflexes and coordination. (*Id.* at 451.) Her diagnosis was unclear, and she was referred to the emergency room for a possible CT scan. (*Id.*)

On September 9, 2015, Plaintiff presented to Dr. Dina at Parkland for her diabetes. (*Id.* at 453.) She stated that she had the same back and foot pain, but had not been taking her DM medication because the side effects were "worse tha[n] the problem itself." (*Id.*) She was positive for back and joint pain, but was not distressed, had no edema, and was able to walk without assistance. (*Id.* at 453-54.) Dr. Dina noted that Plaintiff had been non-complaint with treatment, but had agreed to restart with her medication. (*Id.* at 454.)

On December 10, 2015, Yvonne Post, D.O., completed a physical residual functional capacity (RFC) assessment for Plaintiff. (*Id.* at 101-02.) She considered her DM a severe impairment, and opined that she could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for a total of six hours in an eight-hour workday, sit for a total of six hours in an eight-hour workday, and push and/or pull without limitations, other than shown

4

for lift and/or carry.  (*Id.*)  Dr. Post found that Plaintiff's allegations were "partially supported" by the evidence of record. (*Id.* at 102.)  SAMC Kavitha Reddy, M.D., affirmed Dr. Post's physical RFC assessment on April 6, 2016.  (*Id.* at 134.)

On January 12, 2016, Plaintiff presented to Parkland for pain and numbness from her right elbow down to her right hand.  (*Id.* at 505.)  She also reported piercing pain in her neck and back that was exacerbated by prolonged standing, walking, and sitting.  (*Id.*)  She admitted that she had not been taking any of her medication and was trying to control her DM with diet only.  (*Id.*)  She exhibited tenderness of the lower cervical spine, mild paravertebral muscle tenderness of lumbar, and positive straight leg raises bilaterally.  (*Id.* at 506.)  The examining physician discussed the importance of medication compliance, and Plaintiff was referred for lab work and back/neck imaging.  (*Id.* at 507.)

On January 14, 2016, an X-ray of her cervical spine showed mild multilevel degenerative changes, most prominent at C6-C7 with anterior and posterior osteophytosis and disc height loss. (*Id.* at 511-12.)  The same day, an X-ray of her lumbar spine revealed mild to moderate multilevel degenerative changes, most pronounced at L4-L5, with degenerative disc disease and facet joint osteoarthritis.  (*Id.* at 514.)

On January 19, 2016, an MRI of her cervical spine showed mild multilevel degenerative changes, including small central disc protrusion at C3-C4, anterior osteophytes at C5-C7, and left paracentral disc protrusion at C7-T1.  (*Id.* at 517.)  The same day, an MRI of her lumbar spine showed minimal grade 1 anterolisthesis of L4 on L5, disc desiccation at L2-L3 and L5-S1 with fatty endplate changes, and multilevel degenerative changes, most prominent at L5-S1, where a left paracentral disc protrusion impinged upon the descending left S1 nerve root that correlated for left

S1 radiculopathy. (*Id.* at 522.)

On June 28, 2016, Plaintiff presented to Parkland with right heel pain. (*Id.* at 531.) She reported that her right heel was painful upon ambulation, and had been for the last 6 months. (*Id.*) She was assessed with right foot pain and a retrocalcaneal spur of the right foot, and was fitted for an orthopedic device for her right foot on September 8, 2016. (*Id.* at 532, 563.)

On July 6, 2016, Plaintiff presented to the orthopedic spine clinic at Parkland with neck and low back pain. (*Id.* at 552.) She described the neck pain as "a constant dull throbbing pain" and the low back pain as "a constant strong pain." (*Id.*) She reported difficulty with prolonged sitting, standing, and walking, and was unable to attend physical therapy. (*Id.*) She also reported severe pain in her right heel from a heel spur. (*Id.*) The examining physician noted that sensation was grossly intact throughout the bilateral upper (CF-T1) and lower (L2-S1) extremities, and that there were no long tract signs present. (*Id.* at 552-53.) Plaintiff was negative for both straight leg raises and Spurling's bilaterally. (*Id.* at 553.) She was referred to physical therapy classes for her neck and back, and was encouraged to maintain an active lifestyle by walking, cycling, swimming, and using an elliptical machine. (*Id.*)

On March 16, 2017, Plaintiff returned to Parkland complaining of lower back pain. (*Id.* at 532-33.) The pain radiated to the right buttock and posterior right thigh and worsened while driving, but she did not take any medications because they were unaffordable. (*Id.* at 543.) She also reported bilateral shoulder pain that was intermittent and related to her chronic neck pain. (*Id.*) Plaintiff was not in apparent distress, but depression was noted from a prior psychological review. (*Id.* at 534.) She was observed with a normal gait and ambulating without assistant devices. (*Id.*) Her musculoskeletal evaluation showed full neck range of motion; positive tenderpoints over the lumbar

spine, paraspinous muscles, bilateral sacroiliac (SI) joint, and bilateral facet loading; and negative bilateral straight leg raises and Spurling's test. (*Id.* at 534-35.) Plaintiff was assessed with poorly-controlled DM, cervical and lumbar spondylosis, lumbar facet arthropathy, and obesity. (*Id.* at 536.) Her right shoulder X-ray revealed moderate acromioclavicular degenerative joint disease and mild glenohumeral degenerative joint disease, while her left shoulder X-ray showed moderate acromioclavicular and glenohumeral degenerative joint disease with marginal osteophyte formation. (*Id.* at 539.)

**C.** **Psychological and Psychiatric Evidence**

On December 1, 2015, Plaintiff presented to Betty Eitel, Ph.D., for a psychological evaluation. (doc. 17-1 at 493.) Her chief complaints were a bone spur, arthritis in her foot and back, diabetes, anxiety (panic attacks), and depression. (*Id.*) Dr. Eitel noted that no medical records were provided for review. (*Id.*) Plaintiff stated that she actively avoided leaving the house because she experienced fear and anxiety when going out alone. (*Id.*) Her anxiety started during childhood, had worsened in the last 5 years, and had been interfering in her everyday life. (*Id.*) She had difficulty sleeping and reported sleeping more during the day due to fatigue. (*Id.* at 493-94.) Plaintiff stated that she was agitated, angry, "snap[ped] a lot," and had "zero tolerance" for people and things they said and did. (*Id.*) She cried daily, did not want to be around others, and had "no motivation to do anything." (*Id.* at 494.) She also had a short attention span and problems concentrating. (*Id.*)

Dr. Eitel noted that Plaintiff was sad and tearful, and cooperative, and her psychomotor activity was normal. (*Id.* at 495.) Her mood was depressed and anxious, affect range was congruent, and facial expression was responsive. (*Id.*) She displayed appropriate and logical thoughts and associations, and had no delusions, hallucinations, or unusual thoughts. (*Id.*) Plaintiff did not know

the city she was in, but knew the date, day of the week, time, and purpose of the interview. (*Id.*) She repeated 4 words immediately after hearing them, but was unable to remember 4 words after a 5-minute delay without prompts. (*Id.*) She recalled her address and social security number and repeated 4 digits forward and backward without error. (*Id.* at 496.) Plaintiff could not do serial threes, but was able to do serial twos and correctly spelled "world" backwards. (*Id.*) She was vague with simple similarities, more concrete on medium similarities, unable to do complex similarities, and could interpret only the most simple common proverbs. (*Id.*) Based on these results and Plaintiff's performance during the session, Dr. Eitel opined that her concentration and ability to encode and retain material appeared "slightly impaired," and her abstract reasoning abilities appeared "below the normal range." (*Id.*)

Dr. Eitel diagnosed Plaintiff with agoraphobia, generalized anxiety disorder (GAD), and major depressive disorder (recurrent episode, moderate), but noted that no third-party corroboration, investigation of previous level of functioning, or assessment of response style/bias were performed as part of her diagnostic conclusions. (*Id.* at 497.) She noted that Plaintiff's anxiety disorders and depressive disorder might remit to some degree with treatment, but significant improvement of her overall functioning was unlikely. (*Id.*) Dr. Eitel opined that Plaintiff had the functional capacity to understand, carry out, and remember instructions only for one-two steps, but she could not sustain concentration and persist in work-related activity at a reasonable pace, maintain effective social interaction on a consistent and independent basis with supervisors, co-workers, and the public, or deal with normal pressures in a competitive work setting. (*Id.*)

On December 15, 2015, SAMC Matthew Wong, Ph.D., completed a Psychiatric Review Technique (PRT) for Plaintiff. (*Id.* at 99-104.) He noted that Plaintiff had affective and anxiety

disorders and found that she was moderately limited in maintaining concentration, persistence, and pace, activities of daily living, and maintaining social functioning, but had no episodes of decompensation. (*Id.* at 100.) Dr. Wong referenced Dr. Eitel's psychological evaluation, but concluded that Plaintiff's alleged limitations attributed to her mental impairments were not wholly credible. (*Id.*) Notably, he found that her medical record did not indicate psychological complaints, signs, or testing, and no mental limitations were ever observed. (*Id.*) Dr. Wong also completed a mental RFC assessment and found that Plaintiff was maximally able to understand, remember, and carry out only simple instructions, make simple decisions, attend and concentrate for extended periods, interact adequately with co-workers and supervisors, and respond appropriately to changes in routine work setting. (*Id.* at 104.)

On April 13, 2016, SAMC Ryan Hammond, Psy. D., generally affirmed Dr. Wong's PRT assessment of Plaintiff, except he found her to be only mildly limited in activities of daily living. (*Id.* at 131.)

### D. Hearing

On May 19, 2017, Plaintiff, her fiancé, and a vocational expert (VE) testified at a hearing before the ALJ. (*Id.* at 40-73.) Plaintiff was not represented, but had been advised that she was entitled to a representative at the hearing. (*Id.* at 42.)

### 1. Plaintiff's Testimony

Plaintiff testified that she was 48 years old, 5' 7" tall, and weighed 211 pounds. (*Id.* at 43.) The combination of her foot and back pain prevented her from working and caused her difficulty with her daily activities, including laundry, cooking, washing dishes, and showering. (*Id.* at 44-45.) When she sat for too long, she had pain in her lower back and in the top of her neck, which affected

her rotator cuffs. (*Id.* at 45.) The pain traveled down her left arm and caused her to lose strength in her left arm and hand. (*Id.* at 46-47.) She previously worked as a personal care attendant helping patients with activities of daily living, and from 2004 to 2011, she worked as a CNA. (*Id.* at 48-49.) From 2015 to 2016, she drove cars for auction for Texas Auto Delivery. (*Id.* at 48, 60-61.) She worked full-time in 2015, but reduced her hours in 2016 because of her health. (*Id.* at 60-61.) In 2016, she also worked as a front desk clerk. (*Id.* at 48.)

The bone spur in her right foot and back pain caused her problems with walking and sitting for six out of eight hours a day, and she would stay at home because of her pain and walking limitations. (*Id.* at 50.) Her heel pain had been bothering her since 2011, and she had been fitted with a walking boot. (*Id.* at 51.) She was scheduled for surgery, but had been unable to receive injections for her back pain due to her high blood sugar and diabetes. (*Id.* at 51-52.) Plaintiff's pain was constant, and she could only sit in a chair for approximately 30 minutes before needing to stand up to relieve her pain. (*Id.* at 53-54.) She experienced stiffness and would need to walk around for 10-15 minutes to loosen up before sitting again. (*Id.* at 54.) Her doctors prescribed her Tramadol and Depakote for pain, but she was unable to afford the medication. (*Id.* at 55.) She had been doing physical therapy for her lower back at home. (*Id.* at 57.) Plaintiff rarely went to the movies or store, and her fiancé would do the food shopping. (*Id.* at 58-59.) Her back pain was evenly distributed from the top of her neck to the lower lumbar. (*Id.* at 62-63.) She drove herself to her medical appointments. (*Id.* at 66.)

### 2. Fiancé's Testimony

Plaintiff's fiancé had lived with her for about four years. (*Id.* at 63-64.) After she switched from full-time to part-time work in 2016, she continued experiencing pain when she got home and

was unable to sleep due to her pain. (*Id.* at 64.)  On the weekends, she could only sit, stand, or walk for no more than 15 minutes before complaining of pain, and she was unable to complete tasks around the home like making dinner or doing laundry.  (*Id.* at 65, 67.)  He helped Plaintiff with her physical therapy exercises at home, but they did not relieve her pain.  (*Id.* at 67-68.)

### 3.    VE's Testimony

The VE testified that Plaintiff had previous work experience as a driver, which was light work with a SVP of 2, and as a nurse assistant, which was medium work with a SVP of 4. (*Id.* at 70.) A hypothetical person with the same age, education, and work experience history as Plaintiff, who was limited to sitting six out of eight hours, standing and walking two out of eight hours, and lifting ten pounds because of her medical issues, was capable of sedentary work.  (*Id.* at 71.)  The same hypothetical person would not be able to maintain employment in sedentary work if she was unable to sit for more than 30 minutes at a time and needed to be off task every hour for at least 10 minutes to relieve pain by adjusting position.  (*Id.*)  If the same hypothetical person could lift twenty pounds occasionally and ten pounds frequently, stand and walk six out of eight hours, sit six out of eight hours, and change positions without being off task, she could perform light, SVP-2 work, including that of a mail clerk (102,000 jobs nationally), an information clerk (70,000 jobs nationally), and an office helper (76,000 jobs nationally), but would be unable to perform that work if she needed to be off task for at least 10 minutes every hour to address her pain.  (*Id.* at 71-72.)

## E.    ALJ's Findings

The ALJ issued a decision denying benefits on August 23, 2017. (*Id.* at 21.)  At step one, he found that Plaintiff met the insured status requirements through September 30, 2017, and had not engaged in substantial gainful activity since the alleged onset date of July 27, 2015.  (*Id.* at 23.)  At

step two, the ALJ found that she had the following severe impairments: diabetes, cervical spondylosis, lumbar spondylosis, lumbar facet arthropathy, right heel pain, retrocalcaneal spur of the right foot, and obesity. (*Id.* at 24.) Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the social security regulations. (*Id.* at 26-28.)

Next, the ALJ determined that Plaintiff retained the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), but needed the ability to change positions frequently without being off task. (*Id.* at 28-29.) At step four, the ALJ determined that Plaintiff was unable to perform her past work (*Id.* at 32-33.) At step five, the ALJ found that transferability of job skills was not material to the determination of disability because the Medical-Vocational Rules supported a finding that she was not disabled whether or not she had transferable job skills, but considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she could perform. (*Id.* at 33.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from July 27, 2015, through the date of his decision. (*Id.* at 34.)

## II.  STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558,

564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income.  *See Id.*  The Court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See Id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act.  *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.   An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.   An individual who does not have a "severe impairment" will not be found to be disabled.

3.   An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.   If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.   If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III.  ISSUES FOR REVIEW

Plaintiff presents three issues for review:

1.	Plaintiff's combination of impairments are severe for purposes of the Social Security Act.

2.	The ALJ improperly weighed the medical opinions of Dr. Eitel and the SAMCs.

3.	Plaintiff's impairments meet or equal the listed impairments.[5]

(doc. 23 at 2-4.)

## A.	<u>Mental Impairment</u>

Plaintiff argues that substantial evidence of record does not support the finding that her mental impairments are not severe.  (doc. 23 at 2-3.)  She contends that the ALJ did not provide "awareness" to Dr. Eitel's diagnoses of agoraphobia, GAD, and major depressive disorder, even though her mental health opinion was "accurate and professional."  (*Id.* at 3-4.)  She also contends that the opinions of the SAMCs contain irrelevant statements and are not supported by substantial evidence because they never physically examined her "due to scheduling." (*Id.* at 4.)

In making his disability determination, an ALJ is required to determine whether a claimant has "impairments" which, singly or in combination, are severe. *See* 42 U.S.C. § 1382c. "For Social Security disability purposes, an 'impairment' is an abnormality that can be shown by medically acceptable clinical and laboratory diagnostic techniques, and in fact must be established by medical evidence as opposed to the claimant's subjective statement or symptoms." *Prince v. Barnhart*, 418 F. Supp.2d 863, 867 (E.D. Tex. 2005) (citing 20 C.F.R. § 416.908).  When determining whether a claimant's impairments are severe, an ALJ is required to consider the combined effects of all physical and mental impairments, regardless of whether any impairment, considered alone, would

---

[5]Plaintiff's four-page *pro se* brief is liberally construed as raising these issues, based on the substance of the argument. *See McMillan v. Yellow Cab*, 75 F. App'x 315 (5th Cir. 2003) (*pro se* briefs are afforded liberal construction), *cert. denied*, 541 U.S. 946 (2004).

be of sufficient severity. *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (citing 20 C.F.R. §

404.1523). If the ALJ does find a medically severe combination of impairments, "the combined

impact of the impairments will be considered throughout the disability determination process." 20

C.F.R. § 404.1523.

In addition to the severity standard used to evaluate all impairments, the Social Security

Regulations provide even more precise standards to evaluate the severity of a claimant's mental

impairments at each level of the administrative process. *See* 20 C.F.R. § 404.1520a. The evaluation

process is often referred to as "the technique" or the "special technique." *Westover v. Astrue*, No.

4:11-CV-816-Y, 2012 WL 6553102, at *8 (N.D. Tex. Nov. 16, 2012) (citing 20 C.F.R. §

404.1520a), *adopted by* 2012 WL 6553829 (N.D. Tex. Dec. 13, 2012). If the ALJ concludes that

a claimant has a medically determinable mental impairment, he "must then evaluate the degree of

functional loss resulting from the impairment in four separate areas deemed essential for work."

*Boyd v. Apfel*, 239 F.3d 698, 705 (5th Cir. 2001) (citing 20 C.F.R. § 404.1520a(b)(3)). These four

functional areas, known as the "Paragraph B" criteria, are: (1) activities of daily living; (2) social

functioning; (3) concentration, persistence, and pace; and (4) episodes of decompensation. 20

C.F.R. § 404.1520a(c)(3); 20 C.F.R. Pt. 404, Subpt. P. App. 1, § 12.00C. The first three are rated

on a five-point scale as either none, mild, moderate, marked, or extreme, and the fourth is rated on

a four-point scale, ranging from "none" to "four or more episodes." *See* 20 C.F.R. § 404.1520a(c)(4).

After rating the degree of functional limitation, the ALJ determines the severity of the mental

impairment. *See* 20 C.F.R. § 404.1520a(d). If the first three functional areas are rated as "none" or

"mild" and the fourth area is rated as "none," "the ALJ must find the impairment 'not severe,' which

generally concludes the analysis and terminates the proceedings." *Boyd*, 239 F.3d at 705 (citing *Id.*

§ 404.1520a(d)(1)). If the mental impairment is severe but does not meet or medically equal a listed impairment, the ALJ must conduct a mental RFC assessment. *Id.* § 404.1520a(d)(2)-(3); *Boyd*, 239 F.3d at 705.

"The ALJ's written decision must incorporate pertinent findings and conclusions based on the technique and must include a specific finding of the degree of limitation in each of the functional areas described." *Westover*, 2012 WL 6553102, at *8 (citing *Id.* § 404.1520a(e)(4)). Failure to evaluate all alleged mental impairments in accordance with the procedures described in 20 C.F.R. § 404.1520a is reversible error. *See Satterwhite v. Barnhart*, 44 F. App'x 652, 2002 WL 1396957, *1-2 (5th Cir. Jun. 6, 2002) (concluding that the ALJ's failure to complete the psychiatric review technique and issue the requisite findings amounts to legal error mandating remand); *see also Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 726 (9th Cir. 2011) ("An ALJ's failure to comply with 20 C.F.R. § 404.1520a is not harmless if the claimant has a 'colorable claim of mental impairment.'") (citation omitted); *Moore v. Barnhart*, 405 F.3d 1208, 1213-14 (11th Cir. 2005) ("[W]here a claimant has presented a colorable claim of mental impairment, the social security regulations require the ALJ to complete a [PRT] and append it to the decision, or incorporate its mode of analysis into his findings and conclusions. Failure to do so requires remand."); *Montgomery v. Shalala*, 30 F.3d 98, 99-100 (8th Cir. 1994) (reversing and remanding because ALJ failed to evaluate mental disorder in accordance with psychiatric review technique).

Here, Plaintiff's application for benefits claimed that she was disabled due to a number of impairments, including depression and anxiety. (doc. 17-1 at 334.) Dr. Eitel, a consultative examining psychologist, evaluated Plaintiff in December 2015, and noted that she was cooperative with normal psychomotor activity, her mood was depressed and anxious, her affect range was

17

congruent, she displayed appropriate and logical thoughts and associations, her concentration and ability to encode and retain material appeared slightly impaired, and her abstract reasoning was below normal. (*Id.* at 495.) Dr. Eitel determined that Plaintiff's symptoms were consistent with agoraphobia, GAD, and major depressive disorder. (*Id.* at 493-94.) She opined that Plaintiff could understand, carry out, and remember instructions for only one-two steps, but could not sustain concentration and persist in work-related activity at a reasonable pace, maintain effective social interaction on a consistent and independent basis with supervisors, co-workers, and the public, or deal with normal pressures of a competitive work setting. (*Id.* at 497.) Both SAMCs reviewed Plaintiff's medical records and opined that her affective disorder was a severe mental impairment. (*Id.* at 100, 131.) Dr. Wong reviewed the Paragraph B criteria and rated Plaintiff's activities of daily living, social functioning, and concentration, persistence, and pace as "moderate," and episodes of decompensation as "none." (*Id.* at 100.) Dr. Hammond's functional ratings were generally the same, except he rated Plaintiff's activities of daily living as "mild." (*Id.* at 131.)

At step two, the ALJ acknowledged that Plaintiff had agoraphobia, GAD, and major depressive disorder, but found them to be nonsevere mental impairments without discussion of the technique. (*Id.* at 25-26.) At step three, he referenced the listed impairments for depressive disorder (Listing 12.04) and anxiety disorder (Listing 12.06), but there was no further discussion of either listing in his decision. (*Id.* at 26.) Before proceeding to step 4, the ALJ considered the mental RFCs of both SAMCs, but gave them "less weight" because Plaintiff's mental impairments were nonsevere. (*Id.* at 32.) He also considered Dr. Eitel's functionality opinion, but found it inconsistent with her notes from the mental status exam and Plaintiff's medical record. (*Id.*) The ALJ's RFC did not include any mental limitations. (*Id.* at 28-29.)

18

Because Plaintiff's agoraphobia, generalized anxiety disorder, and major depressive disorder were corroborated by objective medical evidence in the record, and ultimately recognized as medically determinable mental impairments by the ALJ, he was required to use the technique to consider and address her mental impairments in his decision. *See Boyd,* 239 F.3d at 705; 20 C.F.R. § 404.1520a(b)(3). The ALJ did not, however, use the technique to evaluate Plaintiff's degree of functional limitations, or cite or discuss 20 C.F.R. § 404.1520a, and he did not document application of the technique in his decision or adopt the evaluations of either SAMC. In failing to evaluate all alleged mental impairments in accordance with the procedures described in 20 C.F.R. § 404.1520a, the ALJ committed error. *See Satterwhite*, 2002 WL 1396957, *1-2.

## B.     Harmless Error

Violation of a regulation constitutes reversible error and requires remand only "when a reviewing court concludes that the error is not harmless." *Pearson v. Barnhart*, No. 1:04-CV-300, 2005 WL 1397049, at *4 (E.D. Tex. May 23, 2005) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)); *see, e.g., West v. Astrue*, No. 1:10CV142-HSO-JMR, 2011 WL 3684069, at *6 (S.D. Miss. July 22, 2011) ("In the Fifth Circuit, however, an ALJ's failure to complete the psychiatric review technique is a procedural error that does not require remand, provided the error has not affected a party's substantial rights."), *adopted by* 2011 WL 3683877 (S.D. Miss. Aug. 23, 2011). Harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Bornette v. Barnhart*, 466 F. Supp.2d 811, 816 (E.D. Tex. Nov. 28, 2006) (citing *Frank*, 326 F.3d at 622).

While the ALJ referenced the PRT findings of the SAMCs and gave their opinions "less weight," he did not address the technique or his findings regarding the degree of Plaintiff's

limitations on the four functional areas.  (*See* doc. 17-1 at 32.)  Because the ALJ did not perform his own PRT and did not rely on an examiner's PRT, it cannot be determined whether his decision regarding the severity of Plaintiff's mental impairments is supported by substantial evidence.  *See Satterwhite*, 2002 WL 1396957, *1-2; *see, e.g., Goin v. Astrue*, No. 3:12-CV-02471-B-BK, 2013 WL 1130050, at *5 (N.D. Tex. Feb. 19, 2013) (concluding that where a non-frivolous claim of mental impairment exists, the ALJ's failure to follow the psychiatric review technique and make the required findings constitutes legal error and requires remand), *adopted by* 2013 WL 1131272 (N.D. Tex. Mar. 19, 2013); *Cruz v. Colvin*, No. EP-12-CV-00179-ATB, 2013 WL 3338591, at *10 (W.D. Tex. July 1, 2013) ("The ALJ's failure to apply the special technique and follow the regulations prevents effective review by the Court and is therefore not harmless."); *compare Byrd v. Barnhart*, 58 F. App'x 595 (5th Cir. 2003) (holding that because "the ALJ conducted the same kind of comprehensive examination she would have had she completed the [PRT]," her failure to complete the PRT did not affect the claimant's substantial rights and was harmless error).  It is therefore conceivable that the ALJ's failure to adhere to the regulations resulted in an improper severity determination, which could result in a different disability determination.  Accordingly, the error is not harmless, and remand is required on this issue.[6]

### IV. CONCLUSION

The Commissioner's decision is **REVERSED,** and the case is **REMANDED** to the Commissioner for further proceedings.

---

[6]Because this error requires remand, and the ALJ's consideration of the opinions of Dr. Eitel and the SAMCs and the listed impairments may affect the remaining issues, it is unnecessary to reach them.

**SO ORDERED** on this 23rd day of September, 2019.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE